**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Jonathan M. Scott (SBN 323322)
JonathanS@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063

*Counsel for Plaintiffs Crystal Molnar and
Cleveland Tubbs*

## CENTRAL DISTICT CALIFORNIA, SOUTHERN DIVISION

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL MOLNAR and CLEVELAND TUBBS, derivatively and on behalf of VIRGIN GALACTIC HOLDINGS, INC., | C.A. No. 8:24-cv-775 |
| Plaintiffs, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| RICHARD BRANSON, MICHAEL COLGLAZIER, RAYMOND MABUS, HENIO ARCANGELI, JR.. LUIGI BRAMBILLA, TINA JONAS, CRAIG KREEGER, WANDA SIGUR, DIANA STRANDBERG, W. GILBERT WEST, GEORGE MATTSON, WANDA AUSTIN, and ADAM BAIN | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| VIRGIN GALACTIC HOLDINGS, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

# **TABLE OF CONTENTS**

I.      NATURE AND SUMMARY OF THE ACTION ........................................1

II.     JURISDICTION AND VENUE.................................................................5

III.    THE PARTIES ...........................................................................................6

        A.      Plaintiffs ........................................................................................6

        B.      Nominal Defendant ........................................................................6

        C.      Individual Defendants ....................................................................6

IV.     SUBSTANTIVE ALLEGATIONS .............................................................8

        A.      Virgin Galactic And Scaled Composites Background.........................8

        B.      Early Problems With Testing And Flights..........................................10

        C.      Legacy VG's Pattern of False Claims About Its Flights ....................12

        D.      Eve And Unity Were Not Designed For Commercial Use.................18

        E.      Legacy VG Never Received Detailed
                Engineering Drawings For Unity And Eve..........................................19

        F.      Legacy VG Failed To Document
                Changes And Repairs To Eve And Unity ............................................20

        G.      The Company Often Failed To
                Maintain And Resolve Known Deficiencies.......................................21

        H.      Virgin Galactic's Inspections Were Deficient And Unreliable .........22

V.      BRANSON'S IMPROPER CONDUCT .....................................................23

VI.     DUTIES OF THE INDIVIDUAL DEFENDANTS.....................................26

        A.      Fiduciary Duties............................................................................26

        B.      Audit Committee Duties.................................................................28

        C.      Duties Pursuant to the Company's
                Code of Business Conduct and Ethics .............................................30

        D.      Control, Access, and Authority......................................................32

        E.      Reasonable and Prudent Supervision..............................................32

VII.    BREACHES OF DUTIES..........................................................................33

VIII.   CONSPIRACY, AIDING AND
        ABETTING, AND CONCERTED ACTION ..............................................36

i

IX.    DAMAGES TO VIRGIN GALACTIC ........................................... 37

X.    DERIVATIVE AND WRONGFUL REFUSAL ALLEGATIONS ............. 39

    A.    Plaintiffs' Demand Allegations ........................................... 39

    B.    The Board's Investigation Was Unreasonable
Under Delaware Law And Its Refusal Of The
Demand Was Not A Valid Exercise Of Business Judgment ............. 42

XI.    CLAIMS FOR RELIEF ........................................................... 46

        COUNT I ........................................................................ 46

        COUNT II ....................................................................... 48

        COUNT III ...................................................................... 49

        COUNT IV ...................................................................... 49

XII.    PRAYER FOR RELIEF ......................................................... 51

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

By and through their undersigned counsel, Plaintiffs Crystal Molnar and Cleveland Tubbs ("Plaintiffs") bring this stockholder derivative action on behalf of Nominal Defendant Virgin Galactic Holdings, Inc. ("Virgin Galactic" or the "Company") and against certain current and former officers and directors of the Company for: (i) issuing false and misleading statements in breach of their fiduciary duties; (ii) insider selling; (iii) unjust enrichment; and (iv) violations of §§ 10(B) and 21D of the Exchange Act.

Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Virgin Galactic and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, interviews, and other publications disseminated by certain of the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, stockholder communications, and postings on Virgin Galactic's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related securities fraud class action, *Lavin v. Virgin Galactic Holdings, Inc.*, No. 1:21-cv-03070-ARR-TAM (E.D.N.Y.) (the "Securities Class Action"); and (e) an inspection of certain non-public books and records pursuant to *8 Del. C.* § 220 ("Section 220 Production").

## I.   <u>NATURE AND SUMMARY OF THE ACTION</u>

1.   Space tourism is an industry that has skyrocketed to the mainstream in the last few years and the demand for space travel is expected to expand at an annual growth rate of 40.2% until 2030.

2.   Virgin Galactic lauds itself as a leader in the space tourism industry with the goal of making space travel available to the general public.   The Company manufactures spacecraft and aeronautical components, in addition to conducting space flights for paying clients.

3.     The Company, in its current form, is the result of a merger (the "Merger") between Social Capital Hedosphia Holdings Corp. ("SCH") and Vieco 10 Limited, a holding company that held Virgin Galactic Vehicle Holdings, Inc. and other affiliated subsidiaries (collectively, "Legacy VG").   Virgin Galactic operationally resembles Legacy VG.[1]

4.     Since its beginning in 2004, Legacy VG utilized two vehicles to conduct its space flights and testing—***the Eve and the Unity***.   However, as described below, these vehicles were merely prototypes, ***which were not designed or built to standards necessary for commercial use***.

5.     The Eve and Unity vehicles work in tandem, with each playing its own role to reach outer space.   The first vehicle, Eve, is an aircraft that flies to approximately 45,000 feet above the Earth, at which point it releases the second vehicle, Unity.   Upon release, Unity ignites its own rockets to complete the journey into outer space.

6.     Prior to the Merger, Eve and Unity had purportedly conducted two successful test flights into space, along with other atmospheric test flights.   The last of these test spaceflights occurred in February 2019.   Because of a mechanical issue, ***the entire crew onboard was almost killed***.   However, this close call was not publicly disclosed for another two years after the near fatal incident.

7.     While Legacy VG publicly proclaimed that its spaceflights were successes, the reality was that these flights revealed ***significant safety issues*** and ***jeopardized the lives*** of test-pilots and passengers.   Because Eve and Unity were prototypes and due to a poor working relationship between Legacy VG and Scaled Composites – a company founded in 1982 and the designer and original builder of the Eve and Unity vehicles – ***they lacked important engineering documentation*** and what

---

[1] "Virgin Galactic" refers to the "Company" after the October 2019 merger (the "Merger") and name change, whereas "SCH" refers to the "Company" prior to the Merger and name change.

little documentation did exist **was inaccurate.**  Moreover, the documentation detailing what parts were installed on the aircraft and when – as well as when certain parts were replaced – was insufficient.

8.     The first indication that all was not well at the Company was in August 2020, when Virgin Galactic delayed scheduled test flights.  In addition, on August 3, 2020, the Company announced that Defendant Branson would not be flying on Virgin Galactic's spacecraft in 2020 after it was reported he was planning to do so.

9.     When flights resumed on December 12, 2020, Unity's rocket system failed to activate upon launch.

10.     Then, on February 1, 2021, Virgin Galactic announced it would be conducting a test flight that month.  On this news, the Company's share price rocketed up to close at $53.79.  However, after the close of trading on February 1, 2021, the *Washington Post*, published a review of a forthcoming book authored by writer, Nicholas Schmidle ("Schmidle"), who had embedded himself at the Company for four years and still maintains personal relationships with many individuals involved with Virgin Galactic's space program.  Schmidle's book is titled *Test Gods: Virgin Galactic and the Making of a Modern Astronaut* and both it and the *Washington Post* review disclosed that the February 2019 spaceflight had **almost killed everyone on board**.

11.     On February 25, 2021, Defendants announced another delay because of an issue with Unity's digital control system.  However, while Defendants blamed the digital control system, which was responsible for an in-flight malfunction in December 2020, at the time Virgin Galactic **was also addressing massive defects** identified in a January and February 2021 inspection.

12.     Eventually, the Company was able to conduct two test flights in May and July of 2021.  After significant media hype, Branson was a passenger on the July flight.  Immediately after the July 2021 flight, **Branson publicly claimed that the flight was "flawless."**

13.   While Virgin Galactic's share price was up after these purportedly successful flights, Virgin Galactic sold $500 million of its shares in the open market. Moreover, on August 10 and August 12, 2021, *Defendant Branson sold every share he was entitled to sell at the time for $300.9 million in proceeds*.

14.   However, unbeknownst to the public, the July 2021 test flight was not "flawless" as Branson proclaimed.  Indeed, on September 1, 2021, *The New Yorker* published an article written by Schmidle, which revealed that during that flight, Unity had *alarmingly strayed outside* of its "landing cone," the zone of space in which the vehicle must remain in order to safely make it back to its runway for landing.  In fact, it was later revealed that Unity left the cone for 1 minute and 41 seconds, which accounted for more than 10% of its glide time.

15.   Due to the significant dangers associated with a prolonged departure from the landing cone, the Federal Aviation Administration ("FAA") expressly prohibits such maneuvers.  In response to the landing cone departure during the July 2021 flight, on September 2, 2021, the FAA opened an investigation into the incident and grounded Unity.  In response to these disclosures, the price per share of the Company's common stock dropped from $26.79 at the close of market on September 1, 2021, to close at $25.99 per share on September 2, 2021.

16.   On August 23, 2023, Plaintiffs issued a written demand (the "Demand") on Virgin Galactic's board of directors (the "Board") to investigate and take the necessary legal action against Branson and any other individuals responsible for the damages Virgin Galactic has sustained as a result of the wrongdoing detailed herein.

17.   Virgin Galactic's Board has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims.  When Plaintiffs made a formal demand for litigation on the Board, the Board determined, without any investigation whatsoever, that it would indefinitely defer consideration of the Demand (defined below).  The Board's

indefinite deferral of the Demand despite the statute of limitations looming amounts to a *de facto* wrongful refusal of the Demand.

18.     Accordingly, Plaintiffs rightfully bring this action in the name of, and on behalf of, Virgin Galactic to vindicate the Company's rights against the Individual Defendants named herein, and to hold them responsible for the grievous damages that they have caused, and will continue to cause, the Company.

## II.    **JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).  Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     This Court has personal jurisdiction over each of the defendants because each Defendant is either a corporation located and conducting business in this district or is an individual, who is either present in this district for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District because Virgin Galactic is headquartered in this District and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## III.   THE PARTIES

### A.   Plaintiffs

23.   Crystal Molnar is a current stockholder of Virgin Galactic.   She first acquired Virgin Galactic common stock on April 22, 2020, and has continuously held such stock during the relevant times alleged herein.

24.   Cleveland Tubbs is a current stockholder of Virgin Galactic.   He first acquired Virgin Galactic common stock on July 28, 2021, and has continuously held such stock during the relevant times alleged herein.

### B.   Nominal Defendant

25.   Virgin Galactic is incorporated under the laws of the State of Delaware and has its principal executive offices located at 1700 Flight Way, Tustin California. Virgin Galactic's stock trades on the New York Stock Exchange under the symbol "SPCE."

### C.   Individual Defendants

26.   Richard Branson ("Branson") is the Company's founder and owner of the "Virgin" brand.   At the time of the Merger, Branson had control over 114,790,438 shares of Virgin Galactic's common stock, or 58.7%, through various subsidiaries of the Company, making him a controlling shareholder of Virgin Galactic during the Relevant Period.   In August 2021 while the Company's stock was trading at artificially inflated prices, Defendant Branson sold all of his Virgin Galactic shares for proceeds of approximately $300 million.   Branson is named as a defendant in a securities class action.[2]

27.   Michael Colglazier ("Colglazier") has served as the Company's President and Chief Executive Officer ("CEO") and a director since July 2020.   Colglazier

---

[2] *Lavin v. Virgin Galactic Holdings, Inc. et al.*, Case No. 1:21-cv-03070-ARR-TAM (E.D.N.Y.) ("Securities Class Action").

received $7,405,794 in total compensation from the Company in 2021 and $10,781,868 in 2022.

28. Raymond Mabus ("Mabus") has served as a director of the Company since April 2023 and as Chair of the Board since June 2023.

29. Henio Arcangeli, Jr. ("Arcangeli") has served as a director of the Company since August 2023, is a member of the Audit Committee, and is a member of the Compensation Committee.

30. Luigi Brambilla ("Brambilla") has served as a director of the Company since November 2023.

31. Tina Jonas ("Jonas") has served as a director of the Company since June 2021, is Chair of the Audit Committee, and is a member of the Nominating and Governance Committee. Jonas received $355,913 in total compensation from the Company in 2021 and $282,500 in 2022.

32. Craig Kreeger ("Kreeger") has served as a director of the Company since October 2019, is Chair of the Safety Committee, and is a member of the Audit Committee. Kreeger received $227,500 in total compensation from the Company in 2021 and $275,000 in 2022.

33. Wanda Sigur ("Sigur") has served as a director of the Company since December 2021, is a member of the Nominating and Corporate Governance Committee, and is a member of the Safety Committee. Sigur received $183,125 in total compensation from the Company in 2021 and $257,000 in 2022.

34. Diana Strandberg ("Strandberg") has served as a director of the Company since April 2023, is a member of the Audit Committee, and is Chair of the Compensation Committee.

35. W. Gilbert West ("West") has served as a director of the Company since February 2021 and is a member of the Board's Safety Committee. West received $390,283 in total compensation from the Company in 2021 and $267,500 in 2022.

36.     George Mattson ("Mattson") served as a director of the Company from October 2019 until June 2023, including as a member of the Nominating and Governance Committee and the Compensation Committee.   Defendant Mattson formerly served as Chair of the Audit Committee.  Mattson received $265,000 in total compensation from the Company in 2021 and $284,048 in 2022.

37.     Wanda Austin ("Austin") served as a director of the Company from October 2019 until August 2023, including as Chair of the Compensation Committee and is a member of the Safety Committee.   Austin received $282,500 in total compensation from the Company in 2021 and $272,500 in 2022.

38.     Adam Bain ("Bain") has served as a director of the Company from October 2019 until June 2023, including as Chair of the Nominating and Governance Committee and a member of the Compensation Committee.  Bain received $207,764 in total compensation from the Company in 2022.

39.     Collectively, the defendants identified in ¶¶26-38 are referred to herein as the "Individual Defendants" and along with Virgin Galactic as the "Defendants".

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Virgin Galactic And Scaled Composites Background

40.     Virgin Galactic began its existence in 2004 as a joint venture between Legacy VG and Scaled Composites, a company that had won the Ansari X Prize, which awarded it $10 million for being the first non-government organization to launch a reusable spacecraft into space within a two-week window.

41.     Scaled Composites was founded by Burt Rutan ("Rutan") in 1982 and was in the business of developing prototype aircrafts, including the "Voyager," which is famous for successfully completing a flight around the world in 1986 without stopping or refueling.  However, Scaled Composites did not focus on developing or creating commercial vehicles and until the joint venture with Legacy VG in 2004, Rotan had never developed a rocket.

42.     As detailed in the Securities Class Action Complaint,[3] according to a former employee identified as FE 8, Scaled Composites did not employ the normal testing procedures utilized by the scientific and aerospace industry.[4]  For example, FE 8 points out that instead of testing its vehicles in wind tunnels, Scaled Composites would gather data by throwing models off the air control traffic tower at Mojave Airport.  In addition, employees would often jump on top of models to test their structural integrity.  While these unorthodox testing procedures may provide data suitable for prototype development, it is unacceptable to utilize these methods for commercial vehicles.  Nevertheless, ***these non-scientific tests were used to develop the two spacecraft that are still used by Virgin Galactic today***—the Unity and Eve.

43.     In 2004, Branson approached Scaled Composites and offered $1 million to put Legacy VG's logo on the spacecraft it was developing and for the right to use its design to develop a commercial shuttle.  Because Scaled Composites was not in the business of developing commercial vehicles, Rutan was hesitant to engage in a partnership with Legacy VG.  However, he reluctantly agreed to develop a prototype that Branson could use for a commercial spacecraft.  After the transaction, Legacy VG held 70% of the venture's stock and Scaled Composites held the remaining 30%.

44.     To develop the spacecraft for Legacy VG, Rutan adapted the same design utilized by Scaled Composites to win the Ansari X Prize.  The design featured two vehicles – one of which would power both shuttles to about 45,000 feet at which time the second shuttle would detach and power itself to outer space – an altitude of approximately 275,000 feet.  Upon completion of their respective missions, both vehicles would expend their fuel and therefore, ***would be required to glide back to earth and land without power.***  As such, the horizontal stabilizers are among the most

---

[3] Securities Class Action, ECF No. 69.

[4] "FE" refers to former Virgin Galactic employees throughout this complaint.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

important components of the vehicles as these are necessary to control the vehicle's glide.

**B.    Early Problems With Testing And Flights**

45.    In 2007, three Scaled Composites employees were killed in an accident while they were conducting tests on rocket fuel, which was a mixture of nitrous oxide and solid rubber.  After the accident, Rutan stated "***I didn't know that nitrous oxide was that dangerous.***"

46.    For the flight tests, Scaled Composites and Legacy VG utilized three main types of flights.  The first of these is known as a captive carry flight, where the shuttle is ferried by another aircraft to 45,000 feet but is not released.  The second is known as a glide test, where the shuttle is released at 45,000 feet and before it glides back to earth without power.  The third type is known as a powered test, where the shuttle engages its rocket engine for a full 60 seconds as it enters space.  Of these types of tests, captive carried flights are the least risky while powered tests are the most dangerous.

47.    Then, in October 2014, a test pilot was killed when the one of Scaled Composites' test aircraft disintegrated during a flight testing a shuttle design.  The incident was deemed ***to have been caused by human error*** because the co-pilot prematurely unlocked a device known as the "feather" while the spacecraft was still in the transonic zone.[5]   However, an investigation conducted by the National Transportation Safety Board ("NTSB") into the incident later concluded that "the probable cause of this accident was Scaled Composites' ***failure to consider and protect against the possibility that a single human error*** could result in a catastrophic hazard to the SpaceShipTwo vehicle."

48.    The surviving Legacy VG pilot told the NTSB that the fact that the feather must be locked in the transonic zone "came up many times" and was "***common knowledge***."

---

[5] In aeronautics, the "transonic zone" refers to speeds between Mach 0.8 and 1.2.

49.     After the incident in 2014, Legacy VG **severed its partnership** with Scaled Composites and began utilizing its sister company, The Spaceship Company, to develop and manufacture its vehicles.

50.     Although Legacy VG switched manufacturers, it continued to utilize the designs of two spacefaring vehicles developed by Scaled Composites—the Eve and Unity.  These vehicles work in tandem, with Eve carrying Unity to 45,000 feet above the Earth, at which point Unity detaches from Eve and uses its rockets to propel itself into space.  Once Unity detaches from Eve, Eve returns to Earth while Unity continues its accent.  Unity spends a few minutes in space before gliding back down to a pre-planned landing zone on Earth.  The accent process utilizes all of Unity's fuel, requiring it to land without any engine thrust.  As such, if the vehicle strays too far from its pre-planned landing zone, it has to conduct a crash landing in an unplanned location.

51.     In the wake of the 2014 accident, Legacy VG claimed it was going to emphasize and embrace safety.  The Company claimed: "We are not starting from scratch even in that respect.  Because our new vehicle is so similar to its predecessor, we benefit from incredibly useful data from 55 successful test flights as well as the brutal but important lessons from one tragic flight test accident." **This new philosophy was pointed out during the unveiling of Unity in February 2016**.  In a press release promoting the unveiling, Legacy VG described its testing plans as follows:

> If you are expecting SpaceShipTwo to blast off and head straight to space on the day we unveil her, let us disillusion you now: this will be a ground-based celebration.  Indeed, our new vehicle will remain on the ground for a while after her unveiling, as we run her through full-vehicle tests of her electrical systems and all of her moving parts.  We already know these things work individually, but one can't simply assume they will all work together—that must be tested and verified. We'll do so quickly, but we won't cut corners.  Once that is done, we'll be eager to get air under the wings of our new spaceship.
>
> * * * * *
>
> After several glide flights have been completed and we are satisfied with the results, rocket-powered test flights are next.  We will execute a thoughtful and steady progression of flights.  Each mission will be designed to test something important: how the heat from the rocket motor dissipates in the

rear of the vehicle, how the vehicle behaves when breaking the sound barrier on both ascent and descent, how closely our models of forces on the vehicle match reality.

* * * * *

When we are confident we can safely carry our customers to space, we will start doing so. We feel incredibly honored that our earliest paying customers already number more than the total number of humans who have ever been to space. Our first spaceflight with paying customers; our first flight full of research experiments; our first flight with a full complement of eight (a feat that has only been accomplished once before in all of history, by the Space Shuttle on mission STS-61A); the dozens of times we will fly the first ever astronaut from a given nation — each of these will be exciting milestones in the history of space exploration.

### C.   <u>Legacy VG's Pattern of False Claims About Its Flights</u>

52.    On March 10, 2016, Legacy VG began its "Integrated Vehicle Ground Testing" (testing the assembled plane on the ground) and claimed that "[t]o the greatest extent possible, we test in flight-like environments."

53.    On September 7, 2016, Legacy VG announced Unity's upcoming experimental flights, stating that:

> Experimental flight test programs are by definition open-ended, and to a great extent each test depends on the data from the test that precedes it. There is no guarantee that everything will work perfectly the first time, and like all programs seeking to take bold steps, we will inevitably have times when things don't go as planned. ***Our team's biggest challenge is to use meticulous planning and preparation to ensure that any such setbacks are dealt with safely, and that every outcome, whether it matches our expectations or not, informs and improves future performance.***

54.    Shortly thereafter, on November 1, 2016, Legacy VG reported that it was beginning glide tests. After the first glide test, Legacy VG issued a press release touting the flight's safety and the precautions taken by the Defendants:

> As expected, for this first gliding test flight, VSS Unity was flying light and slow, achieving a maximum speed of approximately Mach 0.6 while gliding home from an altitude of 50,000 feet. An initial look at the data as well as feedback from our two pilots indicate that ***today's flight went extremely well, but we'll take the time to properly and thoroughly analyze the vehicle's performance before clearing the vehicle for our next test.***

12

55.    On May 1, 2017, Legacy VG announced its next test flight, stating that "[t]his will provide a rigorous test of the feather system in the air, complementing extensive testing already completed on the ground."  The announcement further stated:

> *As noted in our previous post, we'd learned enough from our past test flights to safely take the next step forward in our thorough test flight program*.  That step happened on a successful test flight conducted this morning from the Mojave Air and Space Port, during which we tested VSS Unity's 'feather' re-entry system in flight for the first time.

56.    Although the designs of Eve and Unity were severely flawed, Legacy VG began conducting test flights into space.  *Although Legacy VG touted these test flights as successes, the opposite was in fact true*.  For example, during a test flight on January 11, 2018, a left horizontal stabilizer *malfunctioned on Unity, causing a red warning light to flash in the cockpit*.  Unity's test pilot, Mark Stucky ("Stucky"), realized the aircraft would begin to flip upside down.  To correct the problem, Stucky decided to use Unity's backup power to move the malfunctioned stabilizer.  Fortunately, this maneuver worked and Stucky was able to avoid an almost certain crash.

57.    Although the January 11, 2018, test flight *almost ended in disaster*, Legacy VG issued the following press release:

> January blues? Not a problem in Mojave today as VSS Unity *successfully completed* her seventh glide flight!
>
> It's been a few months since our last flight, during which we worked through a planned period of focused ground time.  This involved extensive analysis, testing and small modifications to ensure vehicle readiness for the higher loads and forces of powered test flight.  Today we tested that work by pushing Unity's atmospheric capabilities hard, touching top-end glide speeds as pilots Mark 'Forger' Stucky and Michael 'Sooch' Masucci completed a busy test card."
>
> * * * * *
>
> Alongside confirming the work that has taken place on the ground, the glide flight tested transonic flight performance, stability and control.  After release from mothership VMS Eve, the spaceship was immediately pushed into a sharp descent, accelerating to Mach 0.9 which is around the maximum airspeed we can achieve without igniting the rocket motor!
>
> At this stage of the glide flight program, each flight is essentially a dry run for rocket-powered test flights. Where possible the team replicates those

powered flight conditions by, for example, adding water ballast to simulate the weight and positioning of the rocket motor.

Congratulations to Forger and Sooch, as well as VMS Eve crew, CJ Sturckow, Kelly Latimer and Richard Starke, *for a well-executed flight*, supported of course by the Virgin Galactic and The Spaceship Company teams on the ground.

58.     On April 5, 2018, Stucky piloted Unity during its first powered test flight requiring Unity to use its rockets after detaching from Eve.  After Unity detached from Eve and was travelling 1.8 times the speed of sound at 60,000 feet, *Unity began to shake violently and Stucky said: "Abort, abort, abort!"  Unity's inertia caused to continue to climb to 85,000 feet, at which time its gyroscope failed*.  Fortunately, Stucky was again able to safely land Unity despite narrowly escaping a catastrophic accident.

59.     Again, Legacy VG issued a press release falsely *touting the flight as a major success*:

We are delighted to report on a major step forward for Virgin Galactic today, as SpaceShipTwo VSS Unity *safely and successfully completed* her first supersonic, rocket-powered flight.  *After two years of extensive ground and atmospheric testing, the passing of this milestone marks the start of the final portion of Unity's flight test program.*

The flight was also significant for Virgin Galactic's Mojave based, sister manufacturing organization, The Spaceship Company.  Unity is the first vehicle to be built from scratch for Virgin Galactic by The Spaceship Company's talented team of aerospace engineers and technicians. *They were justifiably proud today to be a part of this compelling demonstration of their capabilities in* action.

VSS Unity benefits from all the data and lessons gathered from the test program of her predecessor vehicle, VSS Enterprise. *Today's flight saw an envelope expansion for the program as a whole in terms of rocket burn duration, speed and altitude achieved.*

VSS Unity took off this morning into clear Mojave skies at 8:02am with Mark "Forger" Stucky and Dave Mackay in the cockpit, attached to the WhiteKnightTwo carrier aircraft, VMS Eve, piloted today by Mike Masucci and Nicola Pecile.

The mated vehicles climbed to a launch altitude of around 46,500ft over the Sierra Nevada Mountains and while pointing back at Mojave, Eve executed a clean release of Unity. *After a few seconds, Unity's rocket motor was brought to life and the pilots aimed the spaceship upwards into an 80 degree climb, accelerating to Mach 1.87 during the 30 seconds of rocket burn*. The hybrid (nitrous oxide / HTPB compound) rocket motor, which

was designed, built and tested by The Spaceship Company, powered Unity today through the transonic range and into supersonic flight for the first time.

On rocket shutdown, Unity continued an upwards coast to an apogee of 84,271ft before readying for the downhill return. At this stage, the pilots raised the vehicle's tail booms to a 60 degree angle to the fuselage, into the 'feathered' configuration. This unique design feature, **which is key to a reliable and repeatable re-entry capability for a winged vehicle**, incorporates the additional safety mechanisms adopted after the 2014 VSS Enterprise test flight accident.

At around 50,000ft, the tail-booms were lowered again and, while jettisoning the remaining oxidizer, Unity turned towards Mojave for the glide home and a smooth runway landing.

The flight has generated valuable data on flight, motor and vehicle performance which our engineers will be reviewing. It also marks a key moment for the test flight program, entering now the exciting phase of powered flight and the expansion to full duration rocket burns. While we celebrate that achievement, the team remains focused on the challenging tasks which still lie ahead.

60.     Sometime after the April 2018 test flight, Legacy VG was notified by the manufacturer of its Reaction Control System ("RCS") that some of the components in the RCS were defective.   Specifically, these defective components could cause pressurized nozzles, which are used to control and position Unity in space and thin atmosphere, could become stuck open and cause Unity to spin out of control and use up all its pressurized gas.

61.     Instead of resolving this issue, Legacy VG conducted another test flight on May 29, 2018.  In a press release issued the same day, Legacy VG stated:

The focus of today's flight was to expand our understanding of the spaceship's supersonic handling characteristics and control system's performance with vehicle parameters that were closer to the ultimate commercial configuration. This involved shifting the vehicle's center of gravity rearward via the addition of passenger seats and related equipment. The rocket motor burned for the planned 31 seconds and propelled Unity to a speed of Mach 1.9 and an altitude of 114,500 ft. As will be the case for future commercial flights, Unity's unique re-entry feathering system was deployed for the initial descent before the final glide home to a smooth runway landing.

Once in commercial service, Virgin Galactic's spaceships are designed to be turned around and flown at a higher frequency than has traditionally been the case for human spaceflight. The flight today brought that vision a little closer, coming less than two months after Unity's first rocket powered flight. **Great credit goes to the engineering and maintenance teams for working through the first flight's data diligently and efficiently before preparing**

15

*Unity again for flight.*

62.    On July 26, 2018, Legacy VG conducted another test flight with Unity, although the RCS nozzle issue had not yet been resolved and despite Legacy VG knowing that the test pilot, David Mackay ("Mackay"), had inadvertently used RCS to control the vehicle in prior flights due to the poor design of Unity.  This flight was no different and as Mackay again, inadvertently triggered the nozzles causing Unity to roll at a rate 10 times higher than its recommended maximum.  As a result, Mackay ran out of RCS gas and had to utilize backup RCS gas and was barely able to land the vehicle safely.

63.    Ignoring the near catastrophic issue with the RCS gas, Legacy VG issued a press release stating:

> Virgin Galactic test pilots broke Mach 2 this morning, as VSS Unity took her third rocket-powered supersonic outing in less than four months. After a clean release from carrier aircraft VMS Eve at 46,500 ft, pilots Dave Mackay and Mike "Sooch" Masucci lit the spaceship's rocket motor, before pulling up into a near vertical climb and powering towards the black sky at 2.47 times the speed of sound.
>
> * * * * *
>
> After a safe landing back at Mojave Air and Space Port, Chief Pilot Dave Mackay summed up the experience: "It was a thrill from start to finish. Unity's rocket motor performed magnificently again and Sooch pulled off a smooth landing. This was a new altitude record for both of us in the cockpit, not to mention our mannequin in the back, and the views of Earth from the black sky were magnificent."
>
> * * * * *
>
> Every time VSS Unity is tested on the ground, or in the skies, we gain invaluable experience and fresh data. This continuously improves our modelling and helps us optimize objectives and test points as we progressively expand the flight envelope. Today's test, among other things, gathered more data on supersonic aerodynamics as well as thermal dynamics.
>
> * * * * *
>
> Congratulations to everyone at Virgin Galactic and The Spaceship Company today for achieving another significant step towards commercial service. With VSS Unity, VMS Eve and the pilots safely back on the ground, we will now analyze the post-flight data as we plan and prepare for our next flight.

64.     On February 22, 2019, Legacy VG conducted another test flight with Unity flying to above 50 miles over earth.  On board during the flight were pilot David Mackay, co-pilot Frederick Sturckow, and Beth Moses, a former NASA scientist and Legacy VG's chief customer trainer, playing the role of a passenger for the flight.

65.     During the flight, *Unity experienced critical damage to its horizontal stabilizers*.  Two separate journalists corroborated this event, both discovering that the damage was so severe that Legacy VG's head of safety, Todd Ericson ("Ericson"), told Schmidle "*I don't know how we didn't lose the vehicle and kill three people.*"

66.     In a February 2, 2021, article published to the www.parabolicarc.com blog by reporter Doug Messier ("Messier"), a Legacy VG insider was quoted as stating that Unity's whole horizontal stabilizers ruptured.  According to the insider, *the pilots "[l]anded long to avoid media cameras" who were there to film the shuttle's arrival in an attempt to conceal the damage*.

67.     Once in the hangar, both Stucky and Ericson *noticed a large gash running along the trailing edge of the shuttle's right horizontal stabilizer*.  Schmidle, when Moses arrived and saw the gap, he "felt his stomach sink."

68.     Stucky told Schmidle "[i]t looked like someone ripped the caulking out of a bathtub." Ericson told Schmidle "[t]he structural integrity of the entire stabilizer was compromised."

69.     Messier's insider source lends credence to Schmidle's account.  He quotes the insider as saying that Unity's horizontal stabilizers were "[w]ay too damaged to fly again. Whole structure ruptured." *The insider further told Messier that the February 2019 flight was "a close call"*.

70.     According to the amended complaint filed in the Securities Class Action, a former employee, FE 6, was interviewed and asked about the incident.  FE 6 said that Legacy VG was "super lucky" and described the damage to the horizontal stabilizer as looking like it had "popped like a bag of chips", but in the "right spot."  *If the*

17

*horizontal stabilizer "popped like a bag of chips" in a different spot, the crew would have been killed*.

71.     Schmidle's investigation into the matter of the horizontal stabilizers revealed that sometime after December 12, 2018, Legacy VG had removed the thermal shield that was on the stabilizers and replaced it with Kapton, a thin film that also acts as a heat shield.  While replacing the heat shield, engineers accidentally covered air vents that are critical to releasing the air insider the stabilizers as the Unity enters space.  Because the holes were covered, the air could not escape through the holes and this caused a rupture to a weak point in the horizontal stabilizer.

**D.    Eve And Unity Were Not Designed For Commercial Use**

72.     Scaled Composites built Eve and most of Unity.  Although the work on Unity was finished by The Spaceship Company, it was built based on Scaled Composites' designs.  However, Scaled Composites ***never intended to build vehicles suitable for commercial flights***.  Instead, Eve and Unity ***were designed to only last for a few test flights, let alone several years***.  Even though Scaled Composites ***made Legacy VG aware of this, Legacy VG largely ignored this fact and designated the vehicles for commercial use***.

73.     FE 6 described how Unity and Eve were designed and built under the assumption that they would not be used for commercial flights but were instead being built as "research vehicles" and "one-off" prototypes that were "home-built" with "very little" testing.  Accordingly, Legacy VG's contract with Scaled Composites specifically stated that these vehicles were not for commercial use—that they were bare prototypes.  As such, FE 6 stated that Scaled Composites built the vehicles within a limited timeframe and did not conduct significant testing on the materials used in construction because it was not necessary for the vehicles to last more than a few test flights.  ***However, shortly before delivery, Scaled Composites became aware that Legacy VG planned to use the vehicles for commercial purposes***.

74.     Part of FE 6's concern about the vehicles being used commercially was that *they were not certified* under Federal Aviation Administration ("FAA") Part 23, because their *design and use is not deemed to be within industry standard or comport with FAA-recommended best practices*.  To make matters worse, FE 6 stated that Unity and Eve were five and ten years into service, respectively.  As such *they are well-beyond their expected useful lives and Virgin Galactic is "pushing [its] luck" by continuing to use them*.

### E.     Legacy VG Never Received Detailed Engineering Drawings For Unity And Eve

75.     When Legacy VG severed its relationship with Scaled Composites after the accident in 2014, there was no contract in place requiring Scaled Composites to provide any detailed designs or engineering drawings.  Because of this, many of the design documents were sparse and unreliable, *with some even being done in crayon on napkins*.  As such, Legacy VG never received complete design documents.

76.     Significantly, *aeronautical vehicles should be accompanied by engineering drawings, which are detailed representations of the vehicles as they actually exist*.  The purpose of these drawings is to provide crucial information for every component in the vehicle, including the exact thickness and composition of each part, specifications, dimensions, and tolerances so that the part can be manufactured to exact specification.  Engineers utilize these drawings to model and define the vehicles' performance and *to determine the longevity of each part and when they need to be replaced*.

77.     When documentation was actually provided by Scaled Composites, it was often in the form of a first draft and lacked sufficient details, *rendering it unreliable*.  For example, when these engineering drawings were provided to Legacy VG on napkins, according to FE 3, employees had to put "blind faith" in them and "go by what it says," and hope the drawing and Legacy VG's interpretation of the drawings were accurate.  FE 7 reiterated this sentiment saying "*we were just lost*."

78.     Because Scaled Composites did not provide Legacy VG with adequate engineering drawings, ***the Company was often unaware of guessing*** as to the specifications for certain vehicle parts, what parts needed replacing and when, whether the manufacturing practices need improvement, whether parts need to be redesigned, and whether a part was incorrectly installed.

## F.     Legacy VG Failed To Document Changes And Repairs To Eve And Unity

79.     Legacy VG also failed to consistently and thoroughly maintain and keep track of its records, which catalogued any modifications made to Unity and Eve.  This failure included not keeping track of repairs made to the vehicles, which is problematic because many components on the spacecraft were designed to only be used for a limited number of flights.  This failure resulted in Legacy VG often replacing parts *after* they were worn out.

80.     According to one former employee, FE 3, the system used by the Company to track changes was chaotic as it was designed for aircraft that had already been fully designed and tested and was not appropriate for use on a rapidly changing prototype.  For example, the system did not provide for change orders by the engineering team.  Therefore, if the engineering team realized it needed to change an order after it was submitted to other departments, the order had to be cancelled and redone.  This was a frequent occurrence that caused change-order tracking to be a mess.

81.     In addition, the tracking system did not provide sufficient information.  For example, FE 3 detailed how technicians would enter the name, lot number, serial number, and expiration of the part they were installing.  However, when a revision was made, the system would delete all these entries, which would often cause them to be lost.  As such, after multiple rounds of modifications to orders, there was usually no record as to which parts had been installed and when.

### G.   The Company Often Failed To Maintain And Resolve Known Deficiencies

82.   To make matters even more dangerous, Eve and Unity *developed structural cracks on their wings after every test flight*.  These cracks, which were often internal and sometimes deep and long, *could result in a crash on any given flight*.

83.   Every time the vehicles landed, Virgin Galactic would either fix the cracks, thus delaying the flight schedule, *or it would ignore them, thus putting the flight crew and passengers on the next flight at significant risk of death*.  It often chose the latter and, as a result, the vehicles' wings were often covered with cracks.

84.   The Securities Class Action Complaint provides another striking example of this kind of reckless disregard for safety, stating:

> FE 2 reports a particularly striking example of deliberately concealing problems. Before every flight, Virgin Galactic holds a company-wide Flight Readiness Review. Before every formal Flight Readiness Review, particular divisions rehearse their Flight Readiness Review presentations. FE 2 recalls that at one such rehearsal, which Defendant Moses definitely attended and which Director of Safety Tim Logan may have attended, one of FE 2's colleagues presented a slide that said certain maintenance had been deferred because it would affect flight scheduling. A Virgin Galactic Vice-President told FE 2's colleague not to include the slide in the final Flight Readiness Review. According to FE 2, because many of Virgin Galactic's senior management (including Moses) are NASA veterans, they know they can't put "on paper" that Virgin Galactic was deferring maintenance to stick to flight scheduling because "that's how bad things happen." FE 2 himself knew, and knew that others in the company knew, that had there been an accident, the NTSB would investigate and the first thing it would review was the Flight Readiness Review slides.

85.   Another alarming example of the Company's dismissive posture is when it discovered during a 2018 post-flight inspection *that the resin in some of Unity's parts had developed large internal cracks*.  According to FE 2, the Company was "extremely lucky" that the structure did not fail and cause Unity to break apart mid-flight, *almost guaranteeing the death of everyone on board*.  Schimdle corroborated FE 2's account, stating that this discovery:

> [M]ade Stucky uneasy.  He was okay flying an imperfect ship if he knew where the imperfections were.  But on his spectrum of real versus imagined

risks, a bad bond qualified as very real.  He shuddered to think about charging through the atmosphere at twice the speed of sound if suddenly one of those air bubbles in the bond popped and caused the boom to shear off.

86.     Although this account occurred in 2018, *Legacy VG had been aware of this problem since at least 2013*.  For example, Schmidle provided the following correspondence from Moses:

"Heads up", Moses had informed the management team, back in 2013. "We are finding some deeper issues, including the upper wing skin being debonded in places from the wing spar."

87.     Unfortunately, the Company did little to address the issue.  Although Stucky had suggested the engineers inspect every bond, *they only examined one particular location*.  For example, Schmidle stated:

Stucky suggested the engineers test every bond on the ship by slapping industrial-size suction cups on the outer skins and then trying to pull them off. His recommendation was deemed indelicate. Instead, the maintainers cut panels into the flawed boom, so, with the aid of borescopes, the techs, working blind in narrow crevasses with sometimes only an arm inside the ship, could track their progress on a flat-screen monitor.

88.     In a rare instance of taking a proactive measure to improve safety, Legacy VG installed heat shielding on Unity's tail booms and stabilizers after the Company recognized that heat shielding was needed for when it was re-entered the atmosphere. However, the heat shielding proved to be ornamental *because the heat from the rocket engine plume burned it off when it flew into space, every single flight*.

**H.     Virgin Galactic's Inspections Were Deficient And Unreliable**

89.     To make matters worse, Virgin Galactic's inspections and processes *failed to reliably detect problems* with Unity and Eve.  As such, these inspections were largely pro forma. As detailed in the Securities Class Action Complaint, FE 8 once discovered a technician conducting a test that required interpretations of delicate sounds while he was next to an operating power sander.  In another alarming example, during an inspection of Unity before the February 2019 flight it was missed that several panels on horizontal stabilizers were loose, that there was a baggie of screws taped inside the horizontal stabilizers, and that airholes necessary for the horizontal

stabilizers to depressurize during the flight had been covered in Kapton, a type of metalized foil commonly used in the space industry. *Any one of these deficiencies could have brought down Unity*.

90.     Moreover, according to FE 1, Virgin Galactic also *ignored the results* of its own inspections. Defendants attended monthly presentations at which metrics from the Company's tracking repository were presented, including the number of quality and safety tickets that the technicians or inspectors had issued, and the number of tickets that were currently open, had been opened since the previous presentation, and had been closed. In order to keep these numbers low, managers had been extracting "task tickets" and placing them in tracking spreadsheets. Management extracted every ticket concerning human factors, such as fatigue, errors, or the like, that had been reported. Once these task tickets were inputted into the spreadsheets, they were categorized as closed tickets. After the tickets were moved to spreadsheets, the tickets were not addressed, and rarely even revisited. Therefore, *numerous issues went unresolved* as the Company prioritized its schedule over safety.

## V.     BRANSON'S IMPROPER CONDUCT

91.     In May and July 2021, Virgin Galactic was finally able to conduct two test flights. After significant media-hype, it was announced that Branson would be a passenger on the July 2021 test flight.

92.     Unfortunately, the July 2021 flight did not go well. In fact, during the end of this flight, Unity strayed outside of its "landing cone," the zone of space in which the vehicle must remain in order to safely make it back to its runway for landing. This mishap lasted for approximately 10% of the flight time.

93.     Immediately after the flight on July 11, 2021, Branson was interviewed by Bloomberg Markets, during which he had the following exchange with the interviewer:

> **Question:** Well, what does it mean for the company? There was some risk involved. I'm sure that some of your staff looking at me right now were

nervous at points.

**Branson:** Well, look, the company is 17 years, they've had a number of flawless flights.  They've never had any major, major technical issues even, you know, in the last 17 years *and this was absolutely and utterly flawless*.

94.     Branson's statement that  the flight was "absolutely and utterly flawless" was materially false and misleading, because: (i) Unity had dangerously strayed from its vertical glide cone and FAA airspace for a substantial portion of the flight, placing the crew in serious danger; (ii) straying from the landing cone was a mishap under FAA regulations; and, therefore, (iii) the July 11 flight was not "absolutely and utterly flawless" but instead dangerous and in violation of FAA regulations.

95.     Only one month after he was a passenger on one of Virgin Galactic's flights, *Branson sold every share he was entitled to sell (10.4 million shares) for $300 million in proceeds* between August 10 and 12, 2021.

96.     Branson's participation in the flight was the subject of significant media-hype both before and after it took place, of which Branson took full advantage to boost the Company's revenue and stock price.  Indeed, in the Company's quarterly report for the second quarter of 2023, the Company states that "[i]n August 2021, following Sir Richard Branson's successful test flight, we reopened ticket sales to a select group and increased the pricing of our consumer offerings to a base price of $450,000 per seat."

97.     The foregoing insider sales were executed under highly suspicious circumstances and occurred while Virgin Galactic's stock price was artificially inflated due to the misrepresentations and omissions alleged herein. Indeed, the Virgin Galactic stock Branson sold unlawfully as alleged in the Securities Class Action accounted for a substantial portion of his net worth.  In July 2021, Forbes estimated Branson's fortune at $5.7 billion. Branson's share of the V10 sales was $441.5 million, and his personal sales totaled $450.2 million, for total proceeds of $891.7 million.  Thus, his Virgin Galactic sales represented more than 15% of his wealth.

98.     As a controlling shareholder of Virgin Galactic and the founder of the Company, and as a direct result of his experience as a passenger on the July 11, 2021

flight, Branson was privy to material, nonpublic information regarding the truth about the flight and the Company's testing of its flight vehicles.  While misleading the market, Branson used his knowledge of these significant safety issues to sell the Company's stock while the price was artificially inflated.  While in possession of material, adverse, non-public information, Branson sold millions of shares of Virgin Galactic stock at inflated prices.  Specifically, Branson took advantage of the artificially inflated prices to sell his Virgin Galactic shares for substantial proceeds.

99.   On September 1, 2021, the *New Yorker* published an article written by writer, Nicholas Schmidle ("Schmidle"), who had embedded himself at Virgin Galactic for four years and still maintains personal relationships with many individuals involved with Virgin Galactic's space program.  Schmidle's article revealed that during the July 11, 2021, flight on which Branson was a passenger, the Unity had left its landing cone. During the flight, a yellow safety warning light indicating that Unity was about to leave the landing cone appeared and was followed shortly by a red safety warning light indicating the vehicle had left the landing cone.  The article, stated:

> I once sat in on a meeting, in 2015, during which the pilots [who would later pilot] the July 11th [2021] mission—Dave Mackay, a former Virgin Atlantic pilot and veteran of the U.K.'s Royal Air Force, and Mike Masucci, a retired Air Force pilot—and others discussed procedures for responding to an entry glide-cone warning. ***C. J. Sturckow, a former marine and NASA astronaut, said that a yellow light should "scare the s\*\*\* out of you," because "when it turns red it's gonna be too late"; Masucci was less concerned about the yellow light but said, "Red should scare the cr\*p out of you."***

100.   It was revealed that the Unity left the cone for 1 minute and 41 seconds, which accounted for more than 10% of its glide time.  Due to the significant dangers associated with such a prolonged departure from the landing cone, the FAA expressly prohibits such maneuvers.  As a result, the next day on September 2, 2021, the FAA announced that it was grounding Unity.

101.   On this news, the price per share of the Company's common stock declined from $26.79 at the close of market on September 1, 2021 to close at $25.99 per share on September 2, 2021.

# VI.    DUTIES OF THE INDIVIDUAL DEFENDANTS

## A.    Fiduciary Duties

102.   By reason of their positions as officers, directors, and/or fiduciaries of Virgin Galactic, and because of their ability to control the business and corporate affairs of Virgin Galactic, the Individual Defendants owed, and owe, the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Virgin Galactic in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Virgin Galactic and its stockholders so as to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

103.   Each director and officer of the Company owed, and owes, to Virgin Galactic and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

104.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Virgin Galactic, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Virgin Galactic, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and financial prospects so that the market price of the Company's stock would be based on truthful and accurate information.

105.   Because of their advisory, executive, managerial, and directorial positions with Virgin Galactic, each of the Individual Defendants had access to adverse, non-public information about the Company.

106.   To discharge their duties, the officers and directors of Virgin Galactic were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Virgin Galactic were required to, among other things:

(a)   exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner, so as to make it possible to provide the highest quality performance of their business;

(b)   exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and in compliance with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)   when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

(d)   remain informed as to how Virgin Galactic conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Virgin Galactic and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

**B.     Audit Committee Duties**

107.   In addition to the fiduciary duties discussed above, the Individual Defendants serving on the Audit Committee owed specific duties to Virgin Galactic under the Virgin Galactic Holdings, Inc. Audit Committee Charter (the "Audit Charter").  According to the Audit Charter, the purpose of the Audit Committee "is to assist the Board of Directors" in the "oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established."

108.   The Audit Charter charges the Individual Defendants serving on the Audit Committee with the following duties and responsibilities, among others:

*Interaction with the Independent Auditor*

1.     *Appointment and Oversight.*  The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee.  The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

2.     *Annual Report on Independence and Quality Control.*  The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry

or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

*Annual Financial Statements and Annual Audit*

3.    *Audit Problems*.  The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4.    *Form 10-K Review*.  The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5.    *Audit Committee Report*.  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6.    *Form 10-Q Review*.  The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7.    *Review of Earnings Releases*.  The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8.    *Risk Assessment and Risk Management*.  The Committee must: oversee enterprise risk management including the management of financial risks and cybersecurity risks; review and discuss the Company's guidelines and policies with respect to risk assessment and risk management; and discuss with management the steps management has taken to monitor and control these exposures.

9.    *Hiring of Independent Auditor Employees*.  The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

10.    *Complaint Procedures*.  The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

11.    *Review of Related Person Transactions*.  The Committee is responsible for reviewing and approving related person transactions in accordance with the Company's Related Person Transaction Policy and

Procedures.

12.    *Internal Control Over Financial Reporting and Disclosure Controls and Procedures*.   The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.

13.    *Reports to the Board of Directors*.   The Committee must report regularly to the Board regarding the activities of the Committee.

14.    *Committee Self-Evaluation*.   The Committee must at least annually perform an evaluation of the performance of the Committee.

15.    *Review of this Charter*.   The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

### C.    Duties Pursuant to the Company's Code of Business Conduct and Ethics

109.   The Individual Defendants were also bound by the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), which applies to all Virgin Galactic directors, officers and employees.  Among other things, the Code of Conduct states that it contains "general guidelines" for conducting Virgin Galactic's business "consistent with the highest standards of business ethics" and that to the extent the Code of Conduct "requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards."

110.   Specifically, the Code of Conduct includes the following relevant information:

**Confidential Information**

Employees and directors have access to a variety of confidential information regarding the Company. Confidential information includes all non-public information that might be of use to competitors, or, if disclosed, harmful to the Company or its collaborators, customers or suppliers. Employees and directors have a duty to safeguard all confidential information of the Company or 5 third parties with which the Company conducts business, except when disclosure is authorized or legally mandated, and disclosures of confidential information should be made in accordance with the Company's Guidelines for Corporate Disclosure and applicable law. Unauthorized disclosure of any confidential information is prohibited. Additionally, employees and directors should take appropriate precautions to ensure that confidential or sensitive business information, whether it is proprietary to the Company or another company, is not communicated within the Company except to employees and directors who have a need to know such

30

information to perform their responsibilities for the Company. An employee's and director's obligation to protect confidential information continues after the individual leaves the Company. Unauthorized disclosure of confidential information could cause competitive harm to the Company or its collaborators, customers or suppliers and could result in legal liability to you and the Company.

## Compliance With Laws and Regulations

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or an Authorized Officer.

## Compliance with Insider Trading Laws

Consistent with the Company's Insider Trading Compliance Policy, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material non-public information. Employees and directors who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors.

You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact an Authorized Officer for a copy of the Insider Trading Compliance Policy or with any questions you may have about insider trading laws.

## Public Communications and Regulation Fair Disclosure ("FD")

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-

sensitive financial data.

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD. Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders, we must also disclose the information to the public.

The Company has designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. Any employee or director who is not a designated spokesperson of the Company is prohibited from communicating any information about the Company to analysts, institutional investors, other stockholders or representatives of the media, except at the request of the Company's designated spokespersons.

For more information on the Company's policies and procedures regarding public communications and Regulation FD, please contact an Authorized Officer for a copy of the Company's Guidelines for Corporate Disclosure or with any questions you may have about disclosure matters.

### D.  Control, Access, and Authority

111. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Virgin Galactic, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

112. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the Company.

113. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

### E.  Reasonable and Prudent Supervision

114. To discharge their duties, the officers and directors of Virgin Galactic were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of

such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide stockholders and analysts as to the true financial and business prospects, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

(e)    refrain from trading on material, adverse, non-public information; and

(f)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VII.    **BREACHES OF DUTIES**

115.    The Individual Defendants each breached their duties of loyalty and due care, including the subsidiary duties of good faith, oversight, and disclosure, by issuing, or causing the Company to issue, or authorizing the issuance of, or by failing to correct

false and misleading statements and omissions related to the Company's financial and business prospects, which resulting in harm to the Company.

116. Moreover, when a company, such as Virgin Galactic, operates in an environment where externally imposed regulations govern its "mission critical" operations, the board's oversight duties must be more rigorously exercised. This entails a sensitivity to compliance issues critical to the Company. For Virgin Galactic, the safe and successful operation of its space vehicles was a mission critical compliance issue, and thus, the Board's oversight of such practices had to be "rigorously exercised." The "key" is that directors are required to "rigorously" exercise their oversight function over mission critical operations, in whatever venue that may encompass.

117. Here, because the safe and successful operation of its space vehicles was "mission critical" for the Company, *the Board had the obligation* to more "rigorously" ensure that information concerning the safety of its vehicles and operations provided to investors was truthful and accurate when issued. The Individual Defendants breached their oversight responsibilities by failing to follow up on "red flags" concerning the misleading statement alleged herein to ensure that only truthful information was publicly disseminated and that adequate policies, procedures, and controls were in place and working properly to protect the Company from harm.

118. The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action. Virgin Galactic has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

119. Moreover, the Individual Defendants' have undermined their own credibility. As detailed in the order denying in part the defendants' motion to dismiss the second amended complaint ("SAC") filed in the Securities Class Action (the "SAC MTD Order"), the court found that the statement made by Defendant Branson on July 11, 2021, was materially false and misleading because it described his flight on Unity

as "absolutely and utterly flawless," when in fact, the flight had resulted in an airspace violation with Unity leaving its airspace for 1 minute and 41 seconds, which was more than 10% of its entire journey.[6] The SAC MTD Order explained the seriousness of this significant mishap:

> During [the July 2021] flight, Unity dangerously strayed from its landing cone and FAA airspace, thus imperiling the lives of its passengers. Straying was dangerous because Unity glides to a landing upon its return from space; it does not use fuel, and if it is outside of its landing cone it might crash land away from the landing strip.[7]

120. Further, Judge Ross found that the plaintiffs' "allegations that Branson was aware of some problem on his flight do support an inference of scienter."[8] This problem was Unity's departure from its designated airspace. Specifically, Judge Ross noted Defendant Branson's proximity to the situation as it unfolded and stated that "Plaintiffs' allegations support an inference that Branson would have known something on the flight had gone wrong."[9]

121. Further, Judge Ross found that "[t]ogether with Branson's sale of almost $300 million in shares prior to public revelations about his flight, Branson's presence on the flight supports an inference of scienter that survives a motion to dismiss."[10]

122. Regarding loss causation, Judge Ross concluded "that plaintiffs had adequately alleged loss causation with respect to this statement because plaintiffs connected a drop in stock price to the revelation that the FAA had grounded *Unity* and that the flight had deviated from its glide cone."[11]

123. Thus, the Individual Defendants, because of their positions of control and authority as officers and/or directors of Virgin Galactic, were able to, and did, directly,

---

[6] *See* SAC MTD Order at 41.

[7] *Id*. at 8 (internal quotations omitted).

[8] *Id*. at 42.

[9] *Id*. at 43.

[10] *Id*.

[11] *Id*. at 37.

and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Virgin Galactic.

124. Finally, as members of the Audit Committee, the Audit Committee Defendants breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure, the Company permitted the issuance of false and misleading statements concerning the Company's business practices, operations, and financial prospects.

## VIII. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

125. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

126. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead stockholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

127. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, and violations of the federal securities laws; and (b) disguise and misrepresent the Company's actual business and financial prospects.

128.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

129.   Each of the Individual Defendants aided and abetted, and rendered substantial assistance, in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and in furtherance of the wrongdoing.

## IX.   DAMAGES TO VIRGIN GALACTIC

130.   As a result of the Individual Defendants' wrongful conduct, Virgin Galactic disseminated false and misleading statements, and omitted material information, which rendered such statements misleading when made.  The improper statements have devastated Virgin Galactic's credibility, and the Company has been, and will continue to be, severely damaged by the Individual Defendants' misconduct and oversight failures.

131.   As a direct and proximate result of the Individual Defendants' actions as alleged above, the Company's market capitalization has been substantially damaged, losing billions of dollars as a result of the conduct described herein.  As a direct and proximate result of the Individual Defendants' actions as alleged herein, Virgin Galactic's market capitalization has been substantially damaged. Specifically, Virgin Galactic's share price closed at a high of $40.69 on July 12, 2021, the first trading day after Defendant Branson's statements about the July 11, 2021, test flight, only to fall to $25.99 on September 2, 2021, when the truth about the flight and other problems with Virgin Galactic's vehicles was finally revealed.  Currently, the Company's stock

trades **at $1.21 per share** and Virgin Galactic's market capitalization is only $482 million.

132. Moreover, these actions have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, Virgin Galactic will suffer from the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, which impairs the Company's ability to raise equity capital or debt on favorable terms. Virgin Galactic stands to incur higher marginal costs of capital and debt because of the misconduct.

133. The Individual Defendants' improper course of conduct has also subjected the Company to potentially enormous damages in connection with the Securities Class Action. The Securities Class Action alleges that the Company and other top insiders violated federal securities laws by repeatedly misrepresenting the Company's business, operations, and prospects.[12]

134. The Company was also harmed through the substantial compensation it paid to the Individual Defendants while they were breaching their fiduciary duties owed to Virgin Galactic.

135. Finally, as a direct and proximate result of the Individual Defendants' conduct, Virgin Galactic has needlessly expended, and will continue to expend, significant sums of money. These expenditures include, without limitation: (i) costs incurred in investigating and defending Virgin Galactic and its top insiders in the Securities Class Actions; (ii) lost sales and orders resulting from exposure of the Company's misleading disclosures regarding its business, operations and prospects;

---

[12] *See id*. at 48 (finding "that Branson's July 11, 2021 statement was made with Virgin Galactic's apparent authority, and therefore that his scienter with respect to this statement may be imputed to Virgin Galactic.")

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

and (iii) costs incurred from compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to the Company.

## X.   DERIVATIVE AND WRONGFUL REFUSAL ALLEGATIONS

136.   Plaintiffs incorporate by reference all prior paragraphs as if full set forth herein.

137.   Plaintiffs bring this action derivatively in their own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Virgin Galactic as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Virgin Galactic is named as Nominal Defendant solely in a derivative capacity.

138.   Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting Plaintiffs' rights,

139.   Plaintiffs first acquired shares of Virgin Galactic on April 22, 2020, and July 28, 2021, and both have continuously held those shares since.  Thus, Plaintiffs were stockholders of the Company at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are currently Company stockholders.

140.   As detailed below, Plaintiffs' pre-suit Demand has been wrongfully ignored by the Board, forcing Plaintiffs to file this stockholder derivative action on behalf of the Company.

141.   Given the Board's wrongful, bad-faith, and unreasonable failure to substantively respond to Plaintiffs' lawful Demand to sufficiently investigate the misconduct, and to take sufficient action to remedy the harms caused to the Company, this stockholder derivative action should be permitted to proceed.

### A.   Plaintiffs' Demand Allegations

142.   On May 4, 2023, Plaintiffs sent the Virgin Galactic Board a demand for books and records pursuant to *8 Del. C.* § 220.  After meeting and conferring and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

executing confidentiality agreements, Virgin Galactic made the Section 220 Production to Plaintiffs.

143.    On August 23, 2023, Plaintiffs sent the Board the Demand detailing the wrongdoing explained herein and demanding that the Board investigate and initiate litigation against Branson and any other responsible individuals.  The Demand further requested that the Company, its responsible officers and directors, and Stockholders enter into a tolling agreement to preserve the Company's claims during the pendency of a Board investigation.  A true and correct copy of the Demand is attached hereto as **Exhibit A**.

144.    The Demand described how the Individual Defendants have violated the core fiduciary duty principles described herein during the Relevant Period through their wrongful conduct described above, in the Securities Class Action.  To redress these wrongs and prevent such wrongdoing from occurring again in the future, Plaintiffs demanded the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Branson for his violations of state and/or federal law in connection with the wrongdoing alleged herein; and (ii) commence a civil action against Branson and any responsible director and officer found to have committed or participated in any wrongdoing relating to the facts and conduct described in the Demand, including filing claims for breach of fiduciary duty, insider selling, and unjust enrichment against any offending officer, director, or other person or entity.

145.    Furthermore, Plaintiffs demanded that the Board implement, among other things, the following measures (including bringing all appropriate legal action to enforce any such measures) to redress the wrongs complained of herein and prevent such wrongdoing from occurring again in the future:

- the Board should require the directors and officers to account to the Company or all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or

resolution of the Securities Class Action or any related or similar litigation or investigation arising from the misconduct stated above or in the Securities Class Action;

- the Board should require Branson and any responsible directors and officers to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

- the Board should require Branson and any responsible directors and officers to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct; and

- the Board should adopt and implement internal controls and systems at the Company and its subsidiaries, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future.

146. On September 19, 2023, Plaintiffs received a response letter ("September 19 Letter") from the Board's counsel confirming receipt of the Demand and stating that the Board had decided "to defer making a final decision on the Demand at this time." In the letter, the Board rationalized its decision to defer the Demand on the claimed basis that the allegations contained in the Demand were already the subject of pending litigation against the Company. The letter further stated that the Board had declined to cause the Company to enter into any tolling agreements. A true and correct copy of the September 19, 2023, letter is attached hereto as **Exhibit B**.

147. On October 4, 2023, Plaintiffs' counsel sent a letter ("October 4 Letter") to counsel for the Board urging it to reconsider its position and confirm whether it was pursuing an investigation into the allegations detailed in the Demand, as it was required to. Plaintiffs again requested that the Board enter into a tolling agreement to preserve the Company's claims against the Individual Defendants. The Board has not responded

to this letter from Plaintiffs to date. A true and correct copy of the October 4, 2023, letter is attached hereto as **Exhibit C**.

148. On January 26, 2024, Plaintiffs' counsel sent another letter (the "January 26 Letter") to counsel for the Board, again inquiring about the steps Board has taken to investigate and pursue the allegations detailed in the Demand and urging the Board to reconsider its refusal to enter into a tolling agreement. The Board has not responded to this letter from Plaintiffs to date. A true and correct copy of the January 26, 2024, letter is attached hereto as **Exhibit D**.

149. It has been six months since Plaintiffs' October 4 Letter, to which Virgin Galactic has not responded substantively or otherwise. Instead, the Board has chosen to continue ignoring the Demand.

**B. The Board's Investigation Was Unreasonable Under Delaware Law And Its Refusal Of The Demand Was Not A Valid Exercise Of Business Judgment**

150. The Board is obligated to protect and preserve Virgin Galactic's corporate assets including its damage claims against the Individual Defendants. *Nagy v. Bistricer*, 770 A.2d 43, 55-56 & n.23 (Del. Ch. 2000) (finding breach of fiduciary duty claims are assets of a company); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 548 (Del. Ch. 2015). However, despite Plaintiffs' formal Demand, the Board has failed to take any steps to protect and preserve the Company's valuable claims for breach of fiduciary duty of care, breach of fiduciary duty of loyalty, and indemnification against Defendants.

151. When responding to a demand, a board of directors has an affirmative duty to consider the demand's merits and weigh the costs of taking such an action. Accordingly, the Board wrongfully refused the Demand when it failed to consider the Demand in a timely and appropriate manner. By failing to act upon the Demand, the Board has failed in its "fundamental duty and obligation to protect the corporate enterprise." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985), holding modified by *Coster v. UIP Companies, Inc.*, 300 A.3d 656 (Del. 2023).

152.   The Board's conduct is antithetical to its affirmative duty to protect the interests of Virgin Galactic and to refrain from conduct that would injure the corporation. By failing to act upon the Demand, the Board has failed in its "fundamental duty and obligation to protect the corporate enterprise." *Unocal*, 493 A.2d at 954. Therefore, by virtue of its own actions, the Board has refused the Demand. Accordingly, Plaintiffs may proceed with this derivative action designed to protect the interests of Virgin Galactic vis-à-vis the defendants by, among other things, perfecting the Company's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duties, contribution and indemnification, and related damages against defendants.

153.   The harms complained of in the Demand are actively ongoing and remain unremedied by the Board, causing further damage to the Company with each passing day.  In addition, while the Board is refusing to consider the allegations in the Demand, it is also actively forcing Virgin Galactic to expend vast sums of money in defense of the very wrongdoers responsible for causing harm to the Company in the Securities Class Action, thereby further damaging Virgin Galactic.

154.   Moreover, the Board's unreasonable deferral will subject the Company's claims to the applicable statute of limitations period.  These actions by the Board cannot be reasonably interpreted to be in the best interests of the Company or in good faith. One of Plaintiffs' motives for issuing the Demand and this Complaint is to ensure that all of Virgin Galactic's claims are properly adjudicated, including those facing any upcoming statute of limitations deadline.  Based on Plaintiffs' information and belief, none of the Individual Defendants have executed tolling agreements with the Company to preserve these claims.  *See* **Exhibit B** ("the Board declines to cause the Company to enter into any tolling agreements.")  As such, if the Board were to continue ignoring the Demand, Virgin Galactic may waive certain claims belonging to it and suffer additional harm as a result of Individual Defendants' wrongful conduct.

155. Here, the Board has determined, without any investigation, to defer consideration of the Demand indefinitely – throughout the pendency of the Securities Class Action, which could span months and even years into the future, particularly in the event that either of these actions proceeds to summary judgment briefing and/or trial, and any appeal(s). *See* **Exhibit B**.

156. The Defendants' response to the Demand has only provided Plaintiffs with information demonstrating the incorrect basis for the Board's decision to "defer" its investigation of the Demand. For example, the Board's September 19 Letter states that "[i]n light of the [Securities Class Action] plaintiffs' latest challenge to the motion to dismiss order, the [Securities Class Action] motion to dismiss the Second Amended Complaint remains unresolved. Based on an initial review of the facts, the Board believes it would be in the best interests of Virgin Galactic stockholders and the most efficient use of the Company's resources to defer making a final decision on the Demand at this time." **Exhibit B**. Accordingly, the September 19 Letter did not set forth any investigation or remedial action.

157. Moreover, the September 19 Letter discusses the Securities Class Action plaintiffs' Motion for Reconsideration, Certification for Interlocutory Appeal, and/or Entry of Final Judgment, stating that "[i]f any one of plaintiffs' requested forms of relief is granted, it could substantially alter the state of claims remaining against Branson. In particular, all remaining claims could disappear if the court were to enter judgment against the plaintiffs." **Exhibit B**. However, as Plaintiffs explained in their October 4 Letter responding to Defendants, "the Court in the Securities Class Action is not specifically reconsidering the claims against Branson. Accordingly, there is no valid reason for the Board to defer its investigation regarding the Demand's narrow allegations concerning Branson's wrongful conduct, which does not involve the other claims alleged in the Securities Class Action." **Exhibit C.**

158. Plaintiffs' October 4 Letter also explained that "[t]he Securities Class Action confirms the allegations of wrongdoing against Branson have merit" and points

out that the court in the Securities Class Action "found that Branson's sale of stock immediately after the flight but before the truth emerged further supported an inference of scienter." **Exhibit C**.   Defendants have failed to respond to the assertions in Plaintiffs' October 4 Letter, which again, demonstrates that the Board has improperly deferred the Demand, failed to investigate, and failed to consider or implement any remedial action, polices, procedures, or controls to prevent further harm to the Company.

159.   Plaintiffs' January 26 Letter again attempted to elicit a substantive response from the Board, stating "on December 19, 2023, the Court in the Securities Class Action denied the Motion for Reconsideration and defendants filed their Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint on January 16, 2024.   Accordingly, your purported concerns expressed in the [October 4] Letter are now resolved and Stockholders again request that the Board provide a substantive and detailed response to the inquiries detailed in their October 4, 2023, letter concerning the Board's purported investigation into the Demand." **Exhibit D**.

160.   The January 26 Letter also requested that the Board reconsider its refusal to enter into tolling agreements with the Individual Defendants.   As of the time this complaint was filed, Plaintiffs have not received any response to their October 4 Letter or their January 26 Letter.   As such, Plaintiffs have neither agreed to the Board's deferral nor have the issues raised in the Demand, the October 4 Letter, or January 26 Letter been properly considered, investigated, and addressed by the Board.

161.   The Board's unwarranted and egregious deferral of its consideration of the Demand will unduly prejudice Plaintiffs and Virgin Galactic and is therefore a violation of Delaware law.   The Board's actions thus constitute a wrongful refusal of the Demand.   Accordingly, Plaintiffs have satisfied any demand requirement and may pursue this action on behalf of the Company.

162.   Virgin Galactic has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.   Yet, the Defendants have not

filed any lawsuits against any persons who were responsible for the wrongful conduct. Thus, the Defendants continue to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

163. Plaintiffs have not made any demand on stockholders of Virgin Galactic to institute this action since such demand would be a futile and useless act for the following reasons:

(i) Virgin Galactic is a publicly traded company with thousands of stockholders of record and at least hundreds of thousands of beneficial owners;

(ii) making demand on such a number of stockholders would be impossible for Plaintiffs, who have no means of collecting the names, addresses, or phone numbers of the Company's stockholders; and

(iii) making demand on all stockholders would force Plaintiffs to incur excessive expenses and obstacles, assuming all stockholders could even be individually identified with any degree of certainty.

## XI. CLAIMS FOR RELIEF

### COUNT I

**Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

164. Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

165. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers of Virgin Galactic, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to Virgin Galactic.

166.   The Individual Defendants owed fiduciary duties to Virgin Galactic and its stockholders.

167.   By reason of their positions as fiduciaries to and/or controlling persons of the Company, the Individual Defendants owed duties of good faith, loyalty, candor and truthful disclosure.  In addition, the Individual Defendants had specific fiduciary duties as defined by the Company's corporate governance documents, and principles that, had they been discharged in accordance with the Individual Defendants' obligations, would have prevented the misconduct and the consequent harm to Virgin Galactic.

168.   The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(i)     Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements relating to, among other things, the Company's business, operations and prospects;

(ii)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including, but not limited to, requirements imposed under federal and state securities laws;

(iii)   Failing to implement, maintain and monitor adequate internal controls; and

(iv)    Paying or causing Virgin Galactic to pay themselves compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

169.   As the Individual Defendants breached their fiduciary obligations, the Company has sustained significant damages. Accordingly, the Individual Defendants are liable to Virgin Galactic.

170.   In addition, each of the Individual Defendants had actual knowledge of the Individual Defendants' breaches of fiduciary duties, knowingly participated in the

breaches, and the Company has sustained significant damage as a result.  Accordingly, the Individual Defendants are further liable to Virgin Galactic for aiding and abetting their fellow defendants' breaches.

171.   Plaintiffs, on behalf of Virgin Galactic, have no adequate remedy at law.

## COUNT II

### Insider Trading
### (Against Branson)

172.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

173.   By reason of his fiduciary role with respect to Virgin Galactic, Branson specifically owed and continue to owe the Company the highest obligations of good faith and loyalty.

174.   When Branson sold his Virgin Galactic stock as alleged herein, he was in possession of material, non-public information described above, and sold Virgin Galactic stock because he was motivated, in whole or in part, by the substance of such information.

175.   The information described above was proprietary, non-public information concerning the Company's future business prospects and regulatory compliance status. It was a proprietary asset belonging to the Company, which Branson misappropriated to his own benefit when he sold Virgin Galactic stock.

176.   Branson's sale of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith.  He is therefore liable to Virgin Galactic for unlawful insider trading.

177.   Since the use of the Company's proprietary information for his own gain constitutes a breach of his fiduciary duties, the Company is entitled to disgorgement and/or the imposition of a constructive trust on any profits Branson obtained thereby.

178.   Plaintiffs, on behalf of Virgin Galactic, have no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### (Against the Individual Defendants)

179.   Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

180.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Virgin Galactic.   The Individual Defendants were unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

181.   Branson sold Virgin Galactic stock while in possession of material, adverse nonpublic information that artificially inflated the price of Virgin Galactic stock.   As a result, Branson profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

182.   Plaintiffs, as stockholders and representatives of Virgin Galactic, seek restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

183.   Plaintiffs, on behalf of Virgin Galactic, have no adequate remedy at law.

## COUNT IV

### Derivatively for Contribution Under
### Sections 10(B) and 21D of the Exchange Act
### (Against the Securities Class Action Defendants and Individual Defendants)

184.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

185.   During the Relevant Period, Virgin Galactic and the Securities Class Action Defendants carried out a plan, scheme, and course of conduct which was

intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiffs and other stockholders, as alleged herein; and (ii) caused Plaintiffs and other stockholders to purchase Virgin Galactic common stock at artificially inflated prices.

186.   The Securities Class Action Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Virgin Galactic common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

187.   Virgin Galactic and the Securities Class Action Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

188.   During the Relevant Period, the Securities Class Action Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

189.   Virgin Galactic and the Securities Class Action Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Company and the Securities Class Action Defendants engaged in this misconduct to conceal Virgin Galactic's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

190. Plaintiffs and the stockholders have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Virgin Galactic common stock. Plaintiffs and other stockholders would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Virgin Galactic common stock had been artificially inflated by Defendants' fraudulent course of conduct.

191. As a direct and proximate result of Virgin Galactic's and the Securities Class Action Defendants' wrongful conduct, Plaintiffs and the other stockholders suffered damages in connection with their respective purchases of the Company's common stock during the Relevant Period.

192. By virtue of the foregoing, Virgin Galactic and the Securities Class Action Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## XII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Virgin Galactic, demand judgment as follows:

A. Determining that this action is a proper derivative action maintainable under Delaware law and demand on Virgin Galactic's Board was wrongfully refused;

B. Finding that the Individual Defendants breached their fiduciary duties to the Company, were unjustly enriched, and violated the federal securities laws;

C. Awarding against all the Individual Defendants and in favor of Virgin Galactic the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

D.     Ordering Defendant Branson to disgorge the profits obtained as a result of his sales of Virgin Galactic stock while in possession of material nonpublic information as described herein;

E.     Establishing a constructive trust over the compensation, profits, or other remuneration obtained by the Individual Defendants as a result of their unjust enrichment;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

DATED:  April 9, 2024                    Respectfully Submitted,

**JOHNSON FISTEL, LLP**


*/s/ Brett M. Middleton*
Brett M. Middleton

Frank J. Johnson
Jonathan M. Scott
501 West Broadway, Suite 800
San Diego, CA 92101
(619) 230-0063

*Attorneys for Plaintiffs Crystal Molnar and Cleveland Tubbs*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Crystal Molnar, hereby declare as follows:

I am a plaintiff in this action.  I have reviewed the allegations made in the foregoing verified stockholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant that the foregoing is true and correct.

Signed and Accepted:


Dated: 4/5/2024


DocuSigned by:

_____
34CCDFD3F49F486...

CRYSTAL MOLNAR

DocuSign Envelope ID: 8D1EDED3-33B8-487D-A7C4-ED83A340C782

## **VERIFICATION**

I, Cleveland Tubbs, hereby declare as follows:

I am a plaintiff in this action.  I have reviewed the allegations made in the foregoing verified stockholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant that the foregoing is true and correct.

Signed and Accepted:

Dated: 4/5/2024

DocuSigned by:

*Cleveland Tubbs*

13372DCB780642C...

CLEVELAND TUBBS